## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

NATIONAL SHOOTING SPORTS
FOUNDATION, INC., BERETTA U.S.A.
CORP., DAVIDSON'S, INC., GLOCK,
INC., CENTRAL TEXAS GUN WORKS,
HORNADY MANUFACTURING
COMPANY, LIPSEY'S, LLC, OSAGE
COUNTY GUNS LLC, RSR GROUP, INC.,
SHEDHORN SPORTS, INC., SIG SAUER,
INC., SMITH & WESSON INC., SPORTS
SOUTH LLC, SPRAGUE'S SPORTS INC.
and STURM, RUGER & COMPANY, INC.,

                              Plaintiffs,
        v.

LETITIA JAMES, in her official capacity as
New York Attorney General,

                              Defendant.

Case No.:   1:21-cv-1348 (MAD/CFH)

### COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiffs National Shooting Sports Foundation ("NSSF"), Beretta U.S.A. Corp.
("Beretta"), Central Texas Gun Works LLC ("Central Texas"), Davidson's, Inc. ("Davidson's"),
GLOCK, Inc. ("GLOCK"), Hornady Manufacturing Company ("Hornady"), Lipsey's, LLC
("Lipsey's"), Osage County Guns LLC ("Osage County"); RSR Group, Inc. ("RSR Group"),
Shedhorn Sports, Inc. ("Shedhorn"); SIG Sauer, Inc. ("SIG Sauer"), Smith & Wesson Inc. ("Smith
& Wesson"), Sports South LLC ("Sports South"), Sprague's Sports Inc. ("Sprague's"), and Sturm,
Ruger & Company, Inc. ("Ruger") file this Complaint against Defendant New York Attorney
General Letitia James, in her official capacity.

## INTRODUCTION

1.     This lawsuit challenges the constitutionality of a New York statute that was enacted with the express purpose of overruling the judgment of Congress by expanding New York tort law to regulate the conduct of tens of thousands of businesses operating in every state, regardless of whether those businesses fully comply with all applicable federal, state, and local laws in their home jurisdictions.

2.     New York and its political subdivisions have sought for years to impose civil liability on manufacturers and sellers of firearms and ammunition ("Firearm Industry Members") for criminal or unlawful misuse of their products by third parties in New York—even when those products were lawfully manufactured and sold out of state.

3.     In the early 2000s, New York State sued various handgun manufacturers, wholesalers, and retailers alleging they created a "public nuisance" because "illegally possessed handguns" "endanger the health and safety of a significant portion of the population."  *People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*, 309 A.D. 2d 91, 93 (1st Dep't 2003).  The trial court granted defendants' motion to dismiss, noting that "defendants are engaged in the lawful manufacture, marketing and sale of a defect-free product in a highly regulated activity far removed from the downstream, unlawful use of handguns that is out of their control and constitutes the nuisance alleged."  *Id.*  The Appellate Division affirmed, recognizing the law does not impose "a duty of care [on handgun manufacturers and sellers operating lawfully and selling products free of defects] born of their purported ability to lessen the risks of illegal gun trafficking."  *Id.* at 95.

4.     Following *Spitzer* and many similar lawsuits that sought to impose civil liability on Firearm Industry Members for the criminal acts of third parties, Congress passed the federal Protection of Lawful Commerce in Arms Act ("PLCAA") on a substantial bipartisan basis.  The PLCAA expressly prohibits the filing of qualified civil liability actions, which it defines as:

2

> a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of [firearms or ammunition], or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of [firearms or ammunition] by the person or a third party.

15 U.S.C. § 7903(5)(A).  Congress passed the bill because, as expressed in the text of the statute, such lawsuits are "an abuse of the legal system" and "an unreasonable burden on interstate . . . commerce."  *Id.* § 7901(a)(6).

5.     After the PLCAA was passed, defendants moved to dismiss a different, previously stayed action brought by the City of New York against various out-of-state Firearm Industry Members.  *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 388 (2d Cir. 2008).  The City claimed that the Firearm Industry Members created a "public nuisance" by making and selling firearms that were later brought illegally to New York and used in crimes by others.  *Id*. at 389.  The City argued that its "strict limitations on gun possession are undermined by the uncontrolled seepage into New York of guns sold in other states."  *Id*. at 391.  The Second Circuit held in 2008 that the lawsuit was prohibited by the PLCAA.  *Id*. at 404.  The court further held the PLCAA fell within Congress's constitutionally vested authority to regulate "interstate commerce" because the PLCAA applied only to firearms and ammunition "shipped or transported in interstate or foreign commerce" and so did not intrude on "truly local" matters.  *Id*. at 394-95.

6.     New York is now trying to accomplish through legislation what it was unable to accomplish through litigation.  Earlier this year, former Governor Cuomo signed Senate Bill 7196, now codified at N.Y. Gen. Bus. Law §§ 898-a–e ("the Act").  That statute purports to redefine New York's "public nuisance" law to include the lawful "sale, manufacturing, distribution, importing or marketing of firearms" and other related products ("Firearm and Ammunition Products")—anywhere in the country—if such actions are deemed to "create, maintain or

contribute to a condition in New York State that endangers the safety or health of the [New York] public." *Id*. § 898-b.  Thus, it empowers the State, political subdivisions, and other individual entities (like private citizens, corporations, and associations) to bring civil lawsuits against any Firearm Industry Member whose products (originating out of state) are used by others to allegedly create a "nuisance" in New York. *Id*. § 898-c–d.  In a press release issued shortly after the Act was signed, Defendant James expressly acknowledged that the law was enacted as the New York legislature's attempt to override the federal statutory scheme, calling the PLCAA "federal overreach" and the new statute an "important step to right [the] wrong" of the PLCAA.

7.     In seeking to replace the will of Congress and to impede lawful commerce outside of New York's borders, the Act violates the United States Constitution.  Specifically, it violates the Supremacy Clause because it purports to override the protections from litigation provided by Congress through the PLCAA.  It also violates the Commerce Clause because it seeks to allow New York to regulate interstate commerce, including by discriminating against interstate commerce.  Finally, it violates the Fourteenth Amendment's Due Process Clause because its terms—including a purported prohibition on non-misleading commercial speech and broadly stated burdens on a precondition for exercising the right to keep and bear arms—are impossibly vague.

8.     Plaintiffs—a national trade organization representing the interests of its members who are Firearm Industry Members, as well as fourteen Firearm Industry Members who are also NSSF members—therefore seek declaratory and injunctive relief to have the Act declared unconstitutional and to prevent the State of New York, through Defendant James, from enforcing it.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, thus raising federal questions.

10.     This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because this action, authorized by 42 U.S.C. § 1983, seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of New York and political subdivisions thereof, of rights, privileges, or immunities secured by the United States Constitution and Acts of Congress.

11.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201-2202, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

12.     Venue lies in this Court pursuant to 28 U.S.C. § 1391 because Defendant is located in and performs her official duties in the Northern District of New York and is therefore considered to reside within this district.

## PARTIES

13.     The NSSF is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut.  It is the trade association for the firearm, ammunition, and hunting and shooting sports industry.  It has a membership of more than 9,000 manufacturers, distributors, and retailers of Firearm and Ammunition Products and other industry members throughout the United States, including (i) 213 New York members, and (ii) the fourteen Firearm Industry Members named as Plaintiffs here.

14.     The NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members'

commitment to the safe and responsible sale and use of their products, and promoting a political environment that is supportive of America's traditional hunting and shooting heritage and Second Amendment freedoms.

15.     The NSSF has standing to bring this action because its members—including the fourteen Firearm Industry Members named as Plaintiffs here—are injured by the Act and would have standing to bring this action in their own right.  Furthermore, the interests NSSF seeks to protect in this action are germane to its organizational purpose.

16.     Beretta is a Maryland corporation with its principal place of business in Maryland. Beretta began operations in 1977 and was the supplier of the standard sidearm for the U.S. Armed Forces from 1985 to 2020.  In addition to its sales to the U.S. Government, the company makes and sells firearms to numerous law enforcement agencies throughout the United States and sells sporting shotguns, rifles, handguns, and firearms used for civilian self-defense to thousands of federally licensed firearm dealers in all 50 states.  Beretta is a "federal firearms licensee" or "FFL" licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  Beretta is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

17.     Central Texas is an LLC operating a firearm and ammunition retail business in Texas.  Central Texas is an FFL licensed by the ATF.  Central Texas is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

18.     Davidson's is an Arizona corporation with its principal place of business in Arizona.  Davidson's is a wholesale distributor of sporting goods, including firearms, ammunition, and related accessories.  Davidson's is an FFL licensed by the ATF.  Davidson's is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

19.     GLOCK is a Georgia corporation with its principal place of business in Georgia. GLOCK is a manufacturer, importer, and United States distributor of GLOCK brand products. GLOCK is an FFL licensed by the ATF.  GLOCK is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

20.     Hornady is a Nebraska corporation with its principal place of business in Nebraska. Hornady is a family-owned business that manufactures bullets, ammunition, and related tools and accessories.  Hornady is an FFL licensed by the ATF.  Hornady is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

21.     Lipsey's is an LLC with its principal place of business in Louisiana. Lipsey's is a national sporting goods and firearm wholesaler.  Lipsey's is an FFL licensed by the ATF.  Lipsey's is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

22.     Osage County is an LLC operating a firearm and ammunition retail business in Missouri.  Osage County is an FFL licensed by the ATF.  Osage County is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

23.     RSR Group is a Delaware corporation with its principal place of business in Florida. RSR Group is a nationwide distributor of firearms and shooting sports accessories.  RSR Group is an FFL licensed by the ATF.  RSR Group is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

24.     Shedhorn is Montana corporation operating a firearm and ammunition retail business in Montana.  Shedhorn is an FFL licensed by the ATF.  Shedhorn is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

25.     SIG Sauer is a Delaware corporation with its principal place of business in New Hampshire. SIG Sauer designs and manufacturers various types of firearms, including pistols and

rifles, as well as firearm accessories.  SIG Sauer sells its products to government, military, and law enforcement agencies in the United States and abroad, as well as to distributors and retailers throughout the United States.  SIG Sauer is an FFL licensed by the ATF.  SIG Sauer is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

26.     Smith & Wesson is a Delaware corporation with its principal place of business in Massachusetts.  Smith & Wesson primarily manufactures firearms and parts for firearms.  Smith & Wesson is an FFL licensed by the ATF.  Smith & Wesson is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

27.     Sports South is an LLC with its principal place of business in Louisiana.  Sports South is a wholesale distributor of firearms and shooting sports accessories.  Sports South is an FFL licensed by the ATF.  Sports South is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

28.     Sprague's is an Arizona corporation with its principal place of business in Arizona. Sprague's operates a firearm and ammunition retail business in Arizona.  Sprague's is an FFL licensed by the ATF.  Sprague's is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

29.     Ruger is a Delaware corporation with its principal place of business in Connecticut. Ruger was founded in 1949 and has grown to become one of the largest firearm manufacturers in the United States, principally for the consumer market.  Ruger is an FFL licensed by the ATF. Ruger is a "gun industry member" as defined by the Act.  N.Y. Gen. Bus. Law § 898-a(4).

30.     Defendant James is the Attorney General of New York and, at all times relevant to the Complaint, was acting under color of state law.  Defendant James is the chief legal officer in New York.  "In fulfilling the duties of the State's chief legal counsel, the Attorney General not

only advises the Executive branch of State government, but also defends actions and proceedings on behalf of the State."  https://ag.ny.gov/bureaus.  Defendant James's principal place of business is The State Capitol Building, Albany, New York 12224.

31.    Defendant James has not disavowed future enforcement the Act.  To the contrary, Defendant James has stated that she "look[s] forward to enforcing the Public Nuisance law." https://ag.ny.gov/press-release/2021/attorney-general-james-statement-new-law-allows-nys-hold-gun-manufacturers.

32.    Defendant's enforcement of the Act against Plaintiffs and/or other Firearm Industry Members would be under color of state law within the meaning of 42 U.S.C. § 1983.

33.    Given Defendant James's stated intention to enforce the Act, each of the fourteen Firearm Industry Members named as Plaintiffs presently and reasonably fears imminent prosecution under the Act.

## **FACTS**

## I.    **THE PROTECTION OF LAWFUL COMMERCE IN ARMS ACT.**

34.    The manufacture, possession, sale, and use of Firearm and Ammunition Products in the United States are heavily regulated by federal, state, and local laws.

35.    Yet, for decades, "[l]awsuits have been commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals."  15 U.S.C. § 7901(a)(3).

36.    Congress has expressly recognized that imposing liability on Firearm Industry Members for the "harm caused by those who criminally or  unlawfully misuse firearm products or ammunition products that function as designed and intended":

> is an abuse of the legal system, erodes public confidence in our Nation's laws, threatens the diminution of a basic constitutional right and civil liberty, invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States.

15 U.S.C. § 7901(a)(6).

37. As a result, in 2005, Congress passed the PLCAA, 15 U.S.C. §§ 7901-03, with the stated purpose to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunitions products, and their trade associations" based on harm caused by the criminal or unlawful misuse of firearms by third parties. *Id.* § 7901(b)(1).

38. Congress also explicitly recognized that the PLCAA was intended to prevent the use of qualified civil liability actions "to impose unreasonable burdens on interstate and foreign commerce." 15 U.S.C. § 7901(b)(4).

39. Congress likewise expressed its intention that the PLCAA preserve the Second Amendment "right of the people to keep and bear arms," which is "a basic constitutional right and civil liberty," and the First Amendment rights of Firearms Industry Members. *Id.* § 7901(a)(1), (a)(6), (b)(5).

40. The PLCAA was enacted both to stop the then-pending litigation against Firearm Industry Members and also to preclude future actions based on the criminal or unlawful misuse of Firearm and Ammunition Products by third parties.

41. Accordingly, Congress prohibited a "qualified civil liability action" from being "brought in any Federal or State court." 15 U.S.C. § 7902(a).

42. The PLCAA lists six limited types of claims that are not prohibited as "qualified civil liability action[s]," none of which apply here: (i) an action brought against a transferor convicted under Section 924(h) of Title 18; (ii) an action brought against a seller

for negligent entrustment or negligence per se; (iii) an action in which a manufacturer or seller of a qualified product knowingly violated a state or federal statute applicable to the sale or marketing of the product similar to specific examples given; (iv) an action for breach of contract or warranty in connection with the purchase of the product; (v) an action for physical injuries resulting directly from a defect in design or manufacture of the product; and (vi) an action commenced by the United States Attorney General to enforce the provisions of chapter 44 of Title 18 or chapter 53 of Title 26.  15 U.S.C. § 7903(5).

43.     The six enumerated exceptions were defined by Congress to limit their application to specific circumstances.  The second exception for negligent entrustment, for example, is defined to apply only when a seller supplies a qualified product "when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others."  15 U.S.C. § 7903(5)(B).

44.     The third exception is the "predicate exception," which applies when the manufacturer or seller of a qualified product knowingly violates a "State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought."  15 U.S.C. § 7903(5)(A)(iii).  The predicate exception is intended to include only knowing violations of clearly-defined sale and marketing statutes, limited to those similar to the examples included:

> (I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or

(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of Title 18.

*Id.*

45.     The PLCAA provides no exception for statutes like the Act, which seek to hold Firearm Industry Members liable for alleged "public nuisance" caused by the criminal conduct of third parties.  N.Y. Gen. Bus. Law § 898-c(1).  Such claims founded on the novel expansion of general common-law tort theories were, in fact, the exact type the PLCAA was enacted to prohibit. 15 U.S.C. § 7901(a)(7).

## II.     NEW YORK ENACTS AN UNCONSTITUTIONAL ACT.

46.     On July 6, 2021, then-Governor of New York Andrew Cuomo signed into law SB 7196, titled "An act to amend the general business law, in relation to the dangers to safety and health and creation of a public nuisance caused by the sale, manufacturing, distribution, importing and marketing of firearms."  N.Y. Gen. Bus. Law §§ 898-a–e.

47.     Enacted with the specific purposes of overriding the protections from litigation provided by Congress through the PLCAA, the Act attempts to hold Firearm Industry Members responsible for the alleged creation of a "public nuisance" based on out-of-state conduct that is lawful where it occurred but is later determined to be either unlawful, or even "unreasonable," by a New York judge or jury.  *Id*.  In doing so, moreover, the broad language of the Act—such as imposing liability merely for "contributing" to a "condition"—expands the scope of "public nuisance" law in unprecedented ways, for example, by allowing for liability on a showing of less than proximate cause and by ignoring future defendants' lack of control of the instrumentalities of an alleged nuisance.

48.     The Act itself specifically states its intent to address "the ease at which legal firearms flow into the illegal market," and the fact that "despite stringent state and local laws against the illegal possession of firearms," "according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in New York are purchased outside of New York." NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

49.     In a press release from Defendant James, the Attorney General's office recognized that the Act is directly at odds with the PLCAA in that it seeks to "restore the ability of states and localities to bring civil liability actions against firearm manufacturers and sellers for negligence" that the United States Congress eliminated through the PLCAA.  Defendant James further stated that she believes the PLCAA constitutes "federal overreach," so the Act is an "important step to right that wrong and protect [New York] citizens from gun violence."   https://ag.ny.gov/press-release/2021/attorney-general-james-statement-new-law-allows-nys-hold-gun-manufacturers.

50.     Defendant James has accordingly admitted that the Act was designed to override Congress's decision to prohibit the filing of qualified civil liability actions.  But classifying the underlying lawful conduct as creating a "nuisance," rather than "negligence," does nothing to lessen the Act's conflict with the PLCAA.

51.     The Act declares that:

> No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product.

N.Y. Gen. Bus. Law § 898-b(1).  The Act thereby seeks to expand New York's generic nuisance law to include the lawful manufacture and sale of Firearm and Ammunition Products, as well as the lawful "marketing" of such products, in other states if those Products are later used or possessed

unlawfully in New York.  And it does so by expanding the substantive scope of public nuisance law in new and unprecedented ways.

52.     The Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its [sic] qualified products from being possessed, used, marketed or sold unlawfully in New York state."  N.Y. Gen. Bus. Law § 898-b(2).  "Reasonable controls and procedures" are defined as:

> policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter.

*Id.* § 898-a(2).  The referenced Article twenty-two-A is New York's Consumer Protection From Deceptive Acts and Practices law.  The Act offers no further definitions or guidance.

53.     Violation of either provision of the Act resulting in "harm to the public" is deemed to be "a public nuisance," N.Y. Gen. Bus. Law § 898-c(1), which subjects the Firearm Industry Member to civil liability regardless of whether it "acted for the purpose of causing harm to the public, *id.* § 898-c(2)."

54.     The Act adopts the PLCAA's definition of a "qualified product," N.Y. Gen Bus. Law § 898-a(6), which includes any "firearm . . . or ammunition . . . or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce," 15 U.S.C. § 7903(4) (emphasis added).

55.     By its terms, the Act therefore intentionally and purposefully regulates interstate commerce occurring wholly outside of New York, and excepts solely intrastate commerce of products manufactured and sold entirely within New York's borders.

56.     Under the Act, the New York Attorney General, city corporation counsel on behalf of any New York locality, or any "damaged" "person, firm, corporation or association" may bring a cause of action against a Firearm Industry Member for alleged violations of the Act.  N.Y. Gen. Bus. Law § 898-d–e.

## III.    IMPACT OF THE ACT.

57.     To lawfully engage in the business of manufacturing, importing and/or dealing in firearms, a person or entity must be licensed by ATF.  A person or entity holding such a license is a "federal firearms licensee" or "FFL."

58.     As of January 2021, there were a total of 131,952 FFLs in the United States.  Of that total, only 2.9% (or 3,827) operate in the state of New York.  *See* https://www.atf.gov/firearms/docs/undefined/ffltypebystate01-11-2021pdf/download.

59.     As of January 2021, on the other hand, 97.1% (or 128,125) of all FFLs operate in states outside of New York.  *Id.*

60.     Though New York has only 2.9% of the country's FFLs, it seeks to regulate the conduct of the 97.1% of FFLs operating in other states.

61.     The Act applies only to "qualified products," which are defined by reference to federal law to include only Firearm and Ammunition Products that have been "shipped or transported in interstate or foreign commerce."  N.Y. Gen. Bus. Law § 898-a(6); 15 U.S.C. § 7903(4).

62.     To be covered by the Act, therefore, the firearm or ammunition, or some part thereof, must have originated outside of New York and later have been shipped or transported into New York.

63.     If a Firearm Industry Member, for example, sold a firearm or ammunition in New York to a New York buyer and the product and all of its component parts were manufactured in New York, it would not be a "qualified product" as defined by the Act.

64.     Thus, the Act seeks exclusively to regulate interstate commerce and thereby favor Firearm and Ammunition Products that move solely in intrastate commerce by exempting them from potential liability and, relatedly, punishes Firearm Industry Members whose Firearm and Ammunitions Products move in interstate commerce.

65.     The Act will have far-reaching impacts on FFLs operating lawfully in states outside of New York because they will constantly be at risk of liability.  There is, in effect, no way for them to comply with New York's law.  Any FFL could be held liable even for fully lawful conduct (including its marketing, which is commercial speech protected by the First Amendment) if a judge or a jury in New York later deemed that lawful conduct to be "unreasonable," or to have "contributed" to a dangerous "condition" in New York—a vague standard that the Act does not define.

66.     As an example, consider a Texas FFL that lawfully sells a semi-automatic handgun to a Texas resident who is legally permitted to purchase and possess it.  The sale takes place after the FFL conducts a background check, as required by the Brady Handgun Violence Prevention Act (the "Brady Act"), Pub. L. No. 103-159, 107 Stat. 1536 (1993), and receives a "proceed" from the FBI's National Instant Criminal Background Check System ("NICS").  *See* 28 C.F.R. § 25.6. The firearm is then transported to New York, either by the Texas resident who purchased it or by

a third party, perhaps years later.[1]  The firearm is then used in a crime or is unlawfully possessed in New York State.  (The Act does not require that a "qualified product" be used in a crime for liability to attach; mere unlawful possession is sufficient.)  If the sale of the semi-automatic handgun in Texas is later deemed to have been "unlawful" in New York, the Texas FFL may be held liable for public nuisance under the Act, even though the sale was entirely lawful in Texas. And even if the sale was not deemed "unlawful," the Texas FFL may *still* be held liable for public nuisance under the Act if the Texas FFL's conduct in either selling or marketing the handgun is later deemed to have been "unreasonable," or to have "contributed" to a dangerous "condition," even if the FFL complied with *both* New York and Texas statutes that regulate the sale and marketing of Firearm and Ammunition Products.  Finally, the Texas retailer may also be held liable for failure to adopt ill-defined "reasonable controls" to somehow prevent firearms from being used in a crime or unlawfully possessed in New York.

67.     As another example, Missouri law generally requires Missouri-based FFLs, like Plaintiff Osage County, to complete the transfer of a firearm when it is legal to do so pursuant to federal and Missouri law.  Mo. Rev. Stat. § 571.014.  Missouri law actually makes it a criminal offense for a Missouri-based FFL to refuse to transfer a firearm to a customer simply because a firearm previously sold to that customer had been traced by law enforcement.  *Id.* § 571.014(a). Pursuant to the Act, however, New York courts could consider it to be unreasonable for an FFL to transfer a firearm to a customer when a firearm previously sold to that customer had been traced by law enforcement, even though the FFL was *required* to transfer the firearm under Missouri law or face criminal liability.  The Missouri-based FFL is in an impossible position because Missouri's

---

[1] According to ATF "Firearms Tracing System" data for 2019, the majority of firearms recovered and traced in New York were recovered in a crime more than three years after the date of purchase. https://www.atf.gov/file/147286/download at 3, 8.  *See id.* at 2 for Data Disclaimer.

law conflicts with New York's—and the New York law purports to govern conduct everywhere in the country.

68.     Each Plaintiff fears prosecution because the Act's terms are vague, broad, and highly subjective and allow liability to attach even for conduct fully lawful—and sometimes required under threat of criminal penalty—in the place undertaken.  There is no way for any Plaintiff to attempt to comply because they do not know what a New York court might find to be "unreasonable" or what ill-defined "controls and procedures" a New York court might eventually require.

69.     And because the Act creates liability for Plaintiffs based on the behavior of third-party criminals who are outside Plaintiffs' control, Plaintiffs have no way to even attempt to lessen their potential liability.  The only way to prevent liability under the Act would be to cease operations altogether.

70.     The Act irreparably harms Firearm Industry Members by forcing them to choose between halting their operations or being in fear of the constant possibility of business-ending litigation.

71.     The Act further threatens to inhibit the exercise of First Amendment rights by Firearm Industry Members by imposing potentially massive liability for truthful and non-misleading marketing of Firearm and Ammunition Products that a judge or jury concludes "contribute" to a dangerous "condition" in New York.

72.     If the Act is allowed to stand, it also threatens to inhibit the exercise of Second Amendment rights by singling out Firearm and Ammunition Products for special burdens.

73.     Further, this law is the first of its kind.  If other States pass similar laws, Firearm Industry Members will not be able to comply but will nonetheless be at risk of prosecution in each

state for fully lawful conduct.  This would compound the burdens on First and Second Amendment rights.

### COUNT ONE—VIOLATION OF THE SUPREMACY CLAUSE

74.     The preceding paragraphs are incorporated and re-alleged here.

75.     The Supremacy Clause of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

76.     The PLCAA states that a "qualified civil liability action may not be brought in any Federal or State court."  15 U.S.C. § 7902(a).

77.     The PLCAA defines a "qualified civil liability action" to be "a civil action … against a manufacturer or seller of a qualified product … for damages … or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party."  15 U.S.C. § 7903(5)(a).

78.     In direct conflict with the PLCAA, the Act's express intent is to allow qualified civil liability actions and to hold Firearm Industry Members liable for "[i]llegal firearm violence" caused by the criminal acts of third parties.  2021 Sess. Law News of N.Y. Ch. 237 (S. 7196) (McKinney's).

79.     The PLCAA therefore expressly preempts the Act.

80.     The PLCAA excepts certain actions including those covered by the "predicate exception," which applies when the manufacturer or seller of a qualified product knowingly violates a "State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought."  15 U.S.C. § 7903(5)(A)(iii).  That exception does not apply here.

81.     The predicate exception was intended to apply to knowing violations of clearly-defined federal and state statutes applicable to the sale and marketing of firearms, such as those governing firearm sales record-keeping requirements and illegal disposal of firearms.  15 U.S.C. § 7903(5)(A)(iii).  The Act does not constitute a predicate statute for purposes of the PLCAA.

82.     The predicate exception must be construed narrowly so as not to swallow the statute, which was intended to shield Firearm Industry Members from liability based on manufacturing, marketing, and sales activity that complies with federal and state statutes in the jurisdiction where the manufacturing, marketing, and sales activity is conducted.

83.     The Act does not fall under the predicate exception because, among other things, it does not require a knowing violation (rather, an action may be brought based on "unreasonable" or "reckless" conduct), and it does not address violations of clearly-defined firearm statutes similar to the examples given in the PLCAA.  Rather, it allows "public nuisance" actions based on the generic "sale, manufacturing, importing or marketing" of Firearm and Ammunition Products.  Allowing actions under the Act would eviscerate the PLCAA's intended protection of Firearm Industry Members from liability arising from the criminal or unlawful misuse of Firearm and Ammunition Products by third parties.

84.     Because the PLCAA expressly preempts the Act, and because no exception applies, the Act should be declared facially unconstitutional in violation of the Supremacy Clause and its enforcement should be enjoined because it threatens Plaintiffs with irreparable injury as stated herein and for which there is no adequate remedy at law.

### COUNT TWO—IMPLIED PREEMPTION

85.     The preceding paragraphs are incorporated and re-alleged here.

86.     In addition to express preemption, a state law may be impliedly preempted where it stands as an obstacle to the accomplishment of Congressional purpose or objective.

87.     Congress enacted the PLCAA for the express purpose of prohibiting the filing of a qualified civil liability action in any state or federal court.  15 U.S.C. § 7902(a).

88.     In enacting the PLCAA, Congress determined that imposing liability on Firearm Industry Members for qualified civil liability actions constitutes "an abuse of the legal system," "threatens the diminution of a basic constitutional right and civil liberty," and "invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States."  15 U.S.C. § 7901(a)(6).

89.     The Act undermines the PLCAA's intended purposes by attempting to override federal law and allow Firearm Industry Members to be held liable for qualified civil liability actions.

90.     Accordingly, the PLCAA impliedly preempts the Act.

91.     Because the PLCAA impliedly preempts the Act, it should be declared unconstitutional and its enforcement should be enjoined because it threatens Plaintiffs with irreparable injury for which there is no adequate remedy at law.

### COUNT THREE—VIOLATION OF THE DORMANT COMMERCE CLAUSE
### (Facially Discriminatory)

92.     The preceding paragraphs are incorporated and re-alleged here.

93.     The Commerce Clause, as set forth in Article, I, Section 8 of the United States Constitution, expressly grants Congress the power "[t]o regulate commerce with foreign Nations, among the several States, and with the Indian Tribes."

94.     The "Dormant" Commerce Clause is inherent in the power granted to Congress under the Commerce Clause and provides that, even if federal law is silent on an area of interstate commerce, states may not enact legislation that directly regulates, discriminates against, and/or impermissibly burdens interstate commerce.

95.     The Dormant Commerce Clause prohibits a state from regulating commerce that takes place wholly outside of the state's borders and from punishing a defendant for engaging in conduct that is lawful where it occurs.

96.     State laws that discriminate against interstate commerce are *per-se* invalid under the Dormant Commerce Clause.

97.     The Act adopts the definition of "qualified product" from the PLCAA, N.Y. Gen Bus. Law § 898-a(6), to apply only to a Firearm or Ammunition Product "that has been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4). The Act accordingly applies only to Firearm and Ammunition Products originating in other states and not Firearm or Ammunition Products that are manufactured and sold entirely in New York.

98.     Because the Act does not apply to Firearm and Ammunition Products that are manufactured and sold entirely in New York, it facially discriminates in favor of the economic interests of Firearm Industry Members in New York against out-of-state Firearm Industry Members in violation of the Dormant Commerce Clause.

99.     The Act should be declared unconstitutional and its enforcement should be enjoined because it threatens Plaintiffs with irreparable injury as stated herein and for which there is no adequate remedy at law.

## COUNT FOUR—VIOLATION OF THE DORMANT COMMERCE CLAUSE
### (Discriminatory Effect)

100.     The preceding paragraphs are incorporated and re-alleged here.

101.     State laws that are facially neutral violate the Dormant Commerce Clause if their practical effect is to impermissibly burden interstate commerce.

102.     To that end, states may not enact legislation that renders unlawful a transaction that occurred wholly out of state, or that controls commerce occurring wholly outside their borders.

103.    By purporting to regulate the manufacture and sale of "qualified products" by out-of-state Firearm Industry Members, and purporting to render unlawful transactions occurring wholly out-of-state, the Act burdens interstate commerce in violation of the Dormant Commerce Clause.

104.    Specifically, the Act seeks to regulate the conduct of the 97.1% of FFLs operating outside New York by declaring conduct fully lawful where it occurred unlawful in New York.

105.    For this reason, Congress expressly found when enacting the PLCAA that allowing qualified civil liability actions against Firearm Industry Members constitutes "an unreasonable burden on interstate and foreign commerce of the United States."  15 U.S.C. § 7901(a)(7).

106.    The Act essentially negates the legitimate regulatory regimes governing the sale, marketing, and manufacture of Firearm and Ammunition Products in other states and under federal law by rendering lawful conduct unlawful in New York.  If other states were to enact similar laws, the PLCAA would have no effect.  It would also theoretically require Firearm Industry Members to attempt to comply with the strictest state restrictions (assuming compliance is even possible), regardless of federal law or the law of the individual state of operation, or face liability.  This would allow individual states to establish a national regulatory scheme in violation of the Constitution's delegation of the power to do so to Congress.  The Act therefore discriminates, both facially and in effect, against out-of-state Firearm Industry Members in violation of the Dormant Commerce Clause.

107.    The Act should be declared unconstitutional and its enforcement should be enjoined because it threatens Plaintiffs with irreparable injury as stated herein and for which there is no adequate remedy at law.

## COUNT FIVE—VIOLATION OF THE DORMANT COMMERCE CLAUSE
### (Undue Burden)

108.    The preceding paragraphs are incorporated and re-alleged here.

109.    Even where a state law does not discriminate against interstate commerce, where the law's burdens on interstate commerce clearly outweigh the putative local benefits, the law violates the Dormant Commerce Clause.

110.    As Congress has already determined, lawsuits authorized under the Act place an extreme and unjustified burden on interstate commerce.

111.    Although the alleged purpose of the Act is to reduce "gun violence," the Act does nothing to deter third parties from engaging in criminal acts.

112.    The Act violates the Dormant Commerce Clause because the extreme burdens it places on interstate commerce outweigh any benefits, and the local interest in reducing crime within New York could be achieved by other restrictions that have a lesser impact on interstate commerce.

113.    The Act should be declared unconstitutional and its enforcement should be enjoined because it threatens Plaintiffs with irreparable injury as stated herein and for which there is no adequate remedy at law.

## COUNT SIX—VIOLATION OF DUE PROCESS (VOID FOR VAGUENESS)

114.    The preceding paragraphs are incorporated and re-alleged here.

115.    The Fourteenth Amendment to the United States Constitution provides that no person shall be "depriv[ed] of life, liberty, or property, without due process of law."

116.    The due process clause prohibits vague, arbitrary, or irrational legislation.

117.    A statute or legislation is unconstitutionally vague when the language of the statute does not convey a sufficiently definite warning as to the proscribed conduct when measured by

common understanding or practice.  It is also unconstitutionally vague if it authorizes arbitrary or discriminatory enforcement.

118.    A more "stringent" vagueness test is applied to statutes that "threaten to inhibit the exercise of constitutionally protected rights" or that impose "quasi-criminal" penalties.

119.    The Act purports to impose liability (and potentially punitive damages) on manufacturers and sellers of lawful firearms and associated products, including for the truthful, non-misleading "marketing" of such products.  It thereby brings with it the "possibility of imposing liability on an entire industry," which, among other things, "threatens the diminution of a basic constitutional right and civil liberty."  15 U.S.C § 7901(a)(6).  Because it threatens to inhibit the exercise of both First and Second amendment rights, and to impose quasi-criminal penalties, the Act is subject to a stringent vagueness test.

120.    The Act forbids Firearm Industry Members from "creat[ing], maintain[ing], or contribut[ing] to a condition in New York state that endangers the safety or health of the public[.]"  N.Y. Gen. Bus. Law § 898-b.

121.    The Act offers no definition of what is a covered "condition."

122.    The Act likewise does not define what is meant by one's "contribution."

123.    The Act does not specify what can suffice to "endanger[]" public health or safety.

124.    The Act requires all Firearm Industry Members "who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state" to "establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state."

125.    The Act includes two broad examples but requisite "reasonable controls and procedures" are "not limited to" the examples provided.

126.    The first example alludes to "screening, security, and inventory" practices, but the Act defines none of these terms.

127.    The second example requires Firearm Industry Members to "prevent[] deceptive acts and practices," presumably by other actors, but the Act does not specify whom.

128.    The Act attaches liability for "conduct either unlawful in itself or unreasonable under all the circumstances," but does not define "unlawful" conduct in terms of any particular state's law and does not define what conduct will be considered "unreasonable under all the circumstances."

129.    Firearm Industry Members and other people of ordinary intelligence are not given a reasonable opportunity to understand what conduct the Act requires and prohibits so that they can conduct their business in a manner that will allow them to avoid violating the Act.

130.    Moreover, because the Act does not provide sufficiently clear standards, it will result in arbitrary enforcement of its provisions and will allow unfettered latitude for those enforcing it.

131.    The Act is therefore unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

132.    The Act should be declared unconstitutional and its enforcement should be enjoined because it threatens Plaintiffs with irreparable injury as stated herein and for which there is no adequate remedy at law.

## **PRAYER FOR RELIEF**

Plaintiffs pray for the following relief from the Court:

1.    A declaratory judgment under 28 U.S.C. § 2201 that N.Y. Gen. Bus. Law §§ 898-a–e is unconstitutional on its face or, alternatively, as applied to Plaintiffs, because it expressly

and/or impliedly conflicts with, and is thus preempted by, the PLCAA in violation of the Supremacy Clause;

2.      A declaratory judgment under 28 U.S.C. § 2201 that N.Y. Gen. Bus. Law §§ 898-a–e is unconstitutional on its face or, alternatively, as applied to Plaintiffs, because it discriminates against interstate commerce in violation of the Dormant Commerce Clause, Article I, § 8 of the United States Constitution;

3.      A declaratory judgment under 28 U.S.C. § 2201 that N.Y. Gen. Bus. Law §§ 898-a–e is unconstitutional on its face or, alternatively, as applied to Plaintiffs, because it violates the Fourteenth Amendment to the United States Constitution;

4.      An injunction enjoining Defendant James and her officers, agents, and employees from enforcing or otherwise bringing suit under N.Y. Gen. Bus. Law §§ 898-a–e pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2202;

5.      An award of attorneys' fees and costs of suit herein pursuant to 42 U.S.C. § 1988, or any other applicable law; and

6.      Such other and further relief as the Court may deem just and proper.

Dated:  December 16, 2021

Respectfully submitted,

*/s/ Scott A. Chesin*
SCOTT A. CHESIN
NDNY Bar Roll # 702851
**SHOOK, HARDY & BACON LLP**
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Telephone:   (212) 779-6106
Facsimile:    (929) 501-5545
schesin@shb.com

AMY M. CROUCH (*pro hac vice forthcoming*)
Missouri Bar # 48654
**SHOOK, HARDY & BACON LLP**
2555 Grand Boulevard
Kansas City, MO 64108
Telephone: (816) 474-6560
Facsimile: (816) 421-5547
amcrouch@shb.com

**Counsel for all Plaintiffs**